UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

DAVID A. STEBBINS                                                     PLAINTIFF

VS.                      CASE NO. 4:16-cv00878-BSM

STATE OF ARKANSAS AND
BOONE COUNTY CIRCUIT CLERK                            DEFENDANT

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Brief in Support of his Motion for Summary Judgment.

1. Before getting to the motion itself, I would like to remind this Court of two very important limitations on its power:

(a) First, this court cannot issue a ruling for any motion without giving any explanation behind its ruling. Even when the Court's actions are discretionary (which they are not in a Motion for Summary Judgment), to issue a ruling without an explanation is an automatic abuse of discretion.

    i. See US v. Burrell, 622 F. 3d 961, 964 (8th Cir. 2010) ("We have held that a district court need not give lengthy explanations ... but this does not permit a district court to give no explanation for its decision"); see also Rayes v. Johnson, 969 F. 2d 700, 704-705 (8th Cir. 1992) ("The district court may have had reason to deny Rayes' request for subsequent counsel, but no explanation appears in the record. The request was summarily denied twice").

    ii. See also Slaughter v. City of Maplewood, 731 F. 2d 587, 589 (8th Cir. 1984) ("we neverthe-less find it necessary to remand because we cannot determine from the record whether the district court exercised a reasoned and well-informed discretion, so as to

permit our review for abuse of discretion")

iii. See also Foman v. Davis, 371 US 178, 182 (1962) ("[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules").

iv. See also Gulf Oil Co. v. Bernard, 452 US 89, 103 (1981) ("We conclude that the imposition of the order was an abuse of discretion. The record reveals no grounds on which the District Court could have determined that it was necessary or appropriate to impose this order").

v. See also US v. Walters, 643 F. 3d 1077, 1080 (8th Cir. 2011) ("given the lack of specific findings and the evidence in the record, we find that the district court abused its discretion").

vi. See also Jarrett v. ERC Properties, Inc., 211 F. 3d 1078, 1084 (8th Cir. 2000) ("The district court's good faith finding was stated in conclusory fashion with no explanation ... Therefore, the court abused its discretion").

vii. See also Thongvanh v. Thalacker, 17 F. 3d 256, 260 (8th Cir. 1994) ("A careful review of the record reveals no explanation whatsoever for the reduction. Accordingly, the jury award of $4,000 is restored.").

viii. See also Purcell v. Gonzalez, 549 US 1, 8 (2006) ("There has been no explanation given by the Court ... we vacate the order of the Court of Appeals")

ix. See also Press-Enterprise Co. v. Superior Court of Cal., Riverside Cty., 464 US 501, 513 (1984) ("Thus not only was there a failure to articulate findings with the requisite specificity but there was also a failure to consider alternatives to closure and to

total suppression of the transcript. The trial judge should seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected.").

 x. See also United States v. Grinnell Corp., 384 US 563, 579 (1966) ("The District Court gave no explanation for its refusal to grant this relief. It is so important and customary a provision that the District Court should reconsider it").

 xi. See also Delaware v. Van Arsdall, 475 US 673, 680 (1986) ("In so doing, it offered no explanation why the Chapman harmless-error standard ... is inapplicable here.")

(b) Second, this court cannot raise any defenses on the Defendant's behalf, sua sponte, unless it pertains to the Court's subject-matter jurisdiction.

 i. See Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011) ("'Under [the adversarial system], courts are generally limited to addressing the claims and arguments advanced by the parties. Courts do not usually raise claims or arguments on their own")

 ii. See also Sanchez-Llamas v. Oregon, 548 US 331, 356-57 (2006) ("The consequence of failing to raise a claim for adjudication at the proper time is generally forfeiture of that claim. As a result, rules such as procedural default routinely deny 'legal significance' ... to otherwise viable legal claims")

 iii. See also Sayre v. Musicland Group, Inc., 850 F. 2d 350, 353 (8th Cir. 1988) (failure to plead affirmative defenses constitutes waiver of that defense, even if not specifically listed in Rule 8(c)).

 iv. See also Sartin v. Commissioner of Pub. Saf. of St. of Minn., 535 F. 2d 430, 433 (8th Cir. 1976) (same).

(c)     As such, whatever defenses the Defendants raised in their responsive pleading are the defenses they are stuck with. This Court cannot "bail out" the Defendants by raising defenses the Court believes to be meritorious but that the Defendants "forgot" to raise. This Court must restrict its consideration to the claims raised in the Complaint and the defenses raised in the Answer ... and absolutely nothing else!

## FACTS OF THE CASE

2.  The Court can take judicial notice that I have a long list of statutorily protected activities. See Doc. 2, ¶¶ 9-13 in the current case (especially ¶ 13).

3.  On April 10, 2012, Plaintiff filed a lawsuit in the Boone County Circuit Court, seeking eleven million ($11,000,000) in damages for the torts of malicious prosecution, abuse of process, defamation, breach of contract, conversion, and battery. This case was assigned Case No. CV2012-85-4 by the Boone County Circuit Clerk. See Undisputed Fact No. 1.

4.  On October 7, 2014, the Arkansas Supreme Court assigned Russel Rogers to preside over and judge the state case. See Undisputed Fact No. 2.

5.  On January 23, 2015, the special judge entered an order stating that only the contract and battery claims would continue to be litigated ... in essence, dismissing the other four claims. See Undisputed Fact No. 3.

6.  There was no motion to dismiss or motion to strike the other four claims pending in the state case at the time. See Undisputed Fact No. 4.

7.  An appeal was filed in the state case on July 1, 2015. See Undisputed Fact No. 5.

8.  On September 7, 2016, the Arkansas Court of Appeals remanded the case back to the Circuit Court with instructions to supplement the record by including the January 23, 2015 order as part of the record. This supplemental record was supposed to be due on October 7, 2016. See

Undisputed Fact No. 6.

9.     The Boone County Circuit Clerk never complied with the order to supplement the record, and no indication appears on the record that they ever even so much as attempted to explain the deficiency or request more time to comply. See Undisputed Fact No. 7.

10.    The State of Arkansas made no effort to enforce the Court of Appeals' order against the Boone County Circuit Clerk. See Undisputed Fact No. 8.

11.    The Arkansas state judiciary has openly admitted, numerous times during the state case, that they were ruling against me either primarily or exclusively because they do not like me because of my litigation history. See Undisputed Fact No. 9.

12.    For the past seven years, various government officials have made no secret that they absolutely despise me for my litigation history. Time after time, they have proven that they will either passively deny me justice, or even actively persecute and harass me, because of said hatred. See Undisputed Fact No. 10.

## DISCUSSION AND LAW

13.    Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56. To survive summary judgment, "the issue of fact must be 'genuine.' When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." See Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 US 574, 586 (1986). "It follows from these settled principles that if the factual context renders respondents' claim implausible — if the claim is one that simply makes no economic sense — respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." See *id* at 587.

14. "In order to establish a prima facie case of retaliation, a plaintiff must show (1) that he engaged in a statutorily protected activity, (2) that an adverse action was taken against him, and (3) a causal connection between the adverse action and the protected activity." See Amir v. St. Louis University, 184 F. 3d 1017, 1025 (8th Cir. 1999).

15. The first two of these essential elements are beyond any dispute whatsoever. Both my statutorily protected activities, and the Defendants' adverse actions, are 100% judicially noticeable.

16. The closest the defendants can come to a dispute of fact is the element of causal connection, but even that falls flat. The State has spent the past seven years showing me, time and again, that even if they have another, quasi-legitimate reason for their adverse actions, hatred towards me for my litigation history will almost always be, at the very least, a co-motive.

17. And a co-motive is all I need to recover on a claim of retaliation. Retaliatory animus must be a determining factor in the adverse action; however, "'Determining factor' does not mean that it was the sole or exclusive motivation for the decision made by the Defendants." See Grebin v. Sioux Falls Independent School Dist., 779 F. 2d 18, 20 (8th Cir. 1985).

18. But even if retaliation does have to be the sole motive behind an adverse action (which it does not), that element is still beyond genuine dispute in my favor despite the heightened standard of evidence. Why? Because that's the only motive that makes any sense. Even if the Circuit Clerk had a pretextual excuse for not complying with the Order to Supplement in a timely manner, there is virtually no excuse – pretextual or otherwise – for why they never made any effort to explain themselves prior to the October 7, 2016 deadline, when they first had the chance and could have avoided any outward appearance of impropriety. Furthermore, the State of Arkansas has no excuse, other than retaliatory motive, for not taking any action to enforce the

law against the Circuit Clerk. Even in the astronomical chance that the Defendants could offer a pretextual excuse for any one of these adverse actions, it would be impossible for them to conjure up even the most hypothetical excuse that would simultaneously justify all three. Retaliation is the only motive left, simply by process of elimination. At this point, the odds that retaliation is not, at the very least, a co-motive is so astronomical that it does not constitute a "genuine" dispute of fact, as defined by the Matsushita v. Zenith precedent.

19. For that reason, this Court should presume the Defendants to be acting in retaliation unless they can show evidence that another reason exists.

### Pretextual nature of the Clerk's excuse

20. In their Motion to Dismiss, the Circuit Clerk maintains that she had already included everything in the original record, and that there was nothing to supplement. No order was filed on January 23, 2015, and therefore, she is not at fault for not including it in the record.

21. First of all, it should be emphasized that, at best, this would excuse only the first adverse action that is being complained about. Remember that I am complaining about not one, not two, but three adverse actions: A) the Clerk's failure to supplement the record as-ordered by the Arkansas Court of Appeals, B) the Clerk's failure to take any action at all with the Arkansas Court of Appeals to explain herself and avoid any appearance of impropriety, and C) the State of Arkansas' (acting separately from the Clerk) failure to take any action enforce the Court of Appeals' order against the Clerk for no apparent reason. No one adverse action is singlehandedly responsible for causing this injury; it was all three adverse actions, acting in tandem, that collectively caused me this injury. The other two would not have mattered, were it not for the third.

22. It's just like what I stated in the Complaint in this Case:

> "Even if the Circuit Clerk had a pretextual excuse for not complying with the order in a timely manner, there is virtually no excuse – pretextual or otherwise – **for why they never made any effort to explain themselves prior to the October 7,** 2016 deadline, when she first had the chance and could have avoided any outward **appearance of impropriety** ... Even in the astronomical chance that the Defendants could offer a pretextual excuse for any one of these adverse actions, it would be **impossible for them to conjure up even the most hypothetical excuse that would** simultaneously justify all three."
> Doc. 2, ¶ 27.

23. As such, even if the Clerk could sufficiently prove that the record was already complete when she initially gave it to me, that still does not protect her from liability. Her failure to take any action whatsoever to cause the case to move forward is just as responsible for the injury as her failure to include the order in the first place.

24. But that's assuming that the Clerk is telling the truth in the first place when she says that there never was an order entered on January 23, 2015 in the first place. This is most likely either another lie to cover her butt, or at the very least, evidence of even more adverse action on her part.

25. The first and most obvious sign that she is making this up in response to litigation is that ... she's raising it in response to litigation. The fact that she wanted until now – as opposed to the October 7, 2016 deadline – is itself evidence that she only just now came up with it once her back was too the wall. Even if she had raised it with the AR Court of Appeals, but only after they had found her to be in contempt of court, it would still count as evidence that she only made it up to get out of trouble. The fact that her excuse is A) filed with the wrong court, and B) untimely regardless of which court she files it in, alone shows that she only came up with it just now.

26. Next, there is the fact that she already knew, long before the appeal even got started, that there was supposed to be an order on the record, and she never spoke up about it. This is best evidenced by **Exhibit U**. This is from the jury trial in the state case. As you can see, the Defense

Counsel made it perfectly clear that the special judge had entered an order sua sponte dismissing all but two claims.

27. Because this was during the jury trial, that means that the Clerk was present in the Courtroom at the time. This Court can take judicial notice that, at least in the Boone County Circuit Court, it is their policy to have the Clerk be present for jury trials, although she is not normally required to be present during other affairs of the Court such as motions hearings. But she was present in the Courtroom for this conversation, and that's all that matters.

28. Therefore, she necessarily heard the parties and special judge talking to each other. At that point, she was made aware that an order was supposed to have been entered in "late January 2015." If there was no such order, then she should have said something. At that point, she took on a common law tort duty to act as a reasonably prudent person would. In that case, this means warning the parties and special judge that something was amiss.

29. As a result, even if the Clerk is telling the truth about the lack of a January 23, 2015 order, she is still responsible for it taking this long to sort the problem out. Just like with the second of my three adverse actions in the current case, she had a common law tort duty to act a reasonably prudent person would by speaking up, and she failed to do so. It is just as much her fault (assuming she is not merely lying through her teeth right now, which she probably is) for it coming to this in the first place as she is for not correcting it.

### What is the alternative?

30. If you still need help determining that retaliation was a determining factor in their adverse actions/omissions, just think of this way: What does that mean for the entire state government system if retaliation *wasn't* a factor? If the Clerk's office *didn't* single me out for special treatment, what does that mean for the government as a whole?

31. Is the Clerk saying that this is usually how they respond to direct orders from the Court of Appeals? By simply ignoring it and making no effort to comply or even give the appearance that they are complying? Is the State of Arkansas alleging that their current failure to enforce the law is par to the course, that their standard method of dealing with disobedience of a court order is to simply sit around, munching on donuts, and hoping that the conflict will take care of itself?

32. The only way to accept that I *wasn't* discriminated against by the Clerks' refusal to comply and the State's refusal to enforce the law is if you wanted to admit that the entire system is broken. Retaliation is the only explanation remaining for the adverse actions that is not patently absurd.

### No Discovery Needed

33. I do not believe that a discovery is necessary in this case. If the Defendants had a different, non-retaliatory motive for their adverse actions, they should already know what that reason is. As such, if they cannot whip out evidence for their non-retaliatory motive right at the outset, they have no one to blame but themselves. If they need a discovery before they can offer rebuttal evidence of their motivations, then any excuse they come up with is necessarily pretextual, since it is common sense that an adverse action cannot be motivated by any factors that you did not know about at the time you acted; see Shaver v. Independent Stave Co., 350 F. 3d 716, 724 (8th Cir. 2003) (referencing the "straightforward point that it was quite impossible for the plaintiff's *subsequent* protected activity to have caused the [adverse action]," emphasis added). Even if the Defendants, after full discovery, could dig up dirt on me and uncover two dozen different non-retaliatory motives they could have used, the bottom line is that they were not the cause behind the adverse actions in the current case, and therefore, are automatically pretextual.

34. Therefore, a discovery would be a waste of time, since even if it bears fruit, it is necessarily pretextual fruit. If the Defendants cannot produce rebuttal evidence ***in their Response to this motion***, that should be treated as a confession on their part that their actions were motivated by retaliatory animus.

35. As such, the closest the Defendants come to raising a genuine dispute of fact for trial is still beyond genuine dispute. The Court should enter summary judgment in my favor.

### The Defendants are delusional.

36. All throughout the state case, the defense in that case (David D. Stebbins and his counselor, Jim Goldie), as well as special judge Russel Rogers, accused me of being delusional, and would use that, by itself without more, as grounds to dismiss everything I say out of hand. See **Undisputed Fact No. 12**. But this begs the question ... who exactly is the delusional party, here? Am I delusional for believing I am being persecuted? Or is the belief that I am delusional, in and of itself, the delusional belief? Clearly, the answer is the latter.

37. Why is this important? Because the Defendants appear to believe that, if a person is delusional, everything they say is automatically dismissed out of hand, simply because the person saying it is delusional. In **Exhibit H**, the State, acting through its judicial agent[1], maintained that I was to be denied justice, and that the opposing counsel was not to be punished, SOLELY because he believed me to be delusional ... and therefore, nothing I have to say carries any weight in any proceedings, ever.

38. It is important to note that, to be delusional, the belief must be held despite irrefutable evidence to the contrary. See **Undisputed Fact No. 14**. The evidence must truly be irrefutable; if a person is able to provide a sensible explanation (including, but not limited to, the evidence

---

[1] Which are, in turn, the acts of the State itself. See Pulliam v. Allen, 466 US 522, 541 (1984) (holding that a state acts only through its agents).

itself being forged) as to how their beliefs are still true despite the contradictory evidence, that does not count.

39. At the very least, the belief must be held in complete absence of any supporting evidence. If there is any evidence to support the belief – any whatsoever – the belief should not be classified as delusional, or should, at the very least, require further investigation before such a call can be made.

  (a)   For example, a person might believe that his or her spouse is having an affair. When asked how he knows this, he simply replies "Well ... umm ... I just *know*, okay?!" Then the subject could be classified as delusional.

  (b)   On the other hand, imagine if the subject bases this belief on the grounds that he or she has found semen and other evidence of sexual activity in the master bedroom.

  (c)   Initially, this belief is plausible, and even sympathetic. By this point, it is premature to call the belief "delusional," since the subject has reasonable grounds to suspect adultery.

  (d)   Suppose, for a minute, that the subject hires a private investigator who sets up hidden cameras in the master bedroom to find out where all this semen is coming from. From the ensuing footage, the PI realizes that it is not the client's spouse, but rather, their teenage son, inviting girls from school over to have sex in his parents' bed.

  (e)   When confronted with this evidence of the source of the semen, the client does not abandon the suspicion of adultery, but rather, begins to suspect that his or her son is participating in this affair by intentionally providing evidence to cover up the spouse's actual adultery.

  (f)   That right there would be the tipping point where the client's beliefs would become delusional. But not a moment before. As long as the client still has reasonable grounds to maintain the belief, the belief is not delusional. Only after A) the belief is disproven, and B)

the subject maintains the belief nevertheless, only then does it become delusional.

40. With that established, my belief that I am the victim of persecution is clearly supported by at least some objective evidence. See **Undisputed Fact No. 10**.

41. But it goes far deeper than me merely showing that I am not delusional. Perhaps there are other explanations out there for the adverse actions spoken of in Undisputed Fact No. 10, just as there might be an alternative explanation for the semen in the above hypothetical scenario regarding a potential unfaithful spouse. As you can see from the title of this sub-section, the purpose of this sub-section is not to prove that I am not delusional; it is to prove that the Defendants themselves (acting through their state agents[2]) are delusional themselves when they accuse me of delusion. Let's corroborate *that* with some evidence, shall we?!

42. First, there is the fact that the defendants – both in this case, and the defendants in the state case – felt the need to sensationalize what my accusations and beliefs were in an attempt to make it seem like the outlandishness alone proved the claims false. See **Undisputed Fact No. 13**.

43. The Defendants know full well[3] that a conspiracy only requires a minimum of two parties. If they had assumed that I was accusing only those specific persons (e.g. David D. Stebbins, Wes Bradford, etc.) who I had specifically identified by name, then their actions might be slightly less delusional. However, if they did that, they would have to provide objective evidence on their end to rebut my accusations. But if they made it sound like my accusations were so outlandish that they were bordering on the fantastical, then they could just argue that the falsity of my claims were self-evidence to the point that no rebuttal evidence was needed on their end whatsoever.

---

2  See Footnote #1.
3  The State of Arkansas' own statutes clearly show that only two conspirators are required. See Ark. Code Ann. § 16-55-205. See also Arkansas Model Civil Jury Instructions, AMI 714.

44. This establishes the "bare minimum" standard for delusion I mentioned in ¶ 38 of this Brief. They have no motive for trying to sensationalize my accusations like this, unless they ...

    (a)   ... had already decided that they were going to view me as delusional,

    (b)   ... realized that they did not have even the slightest amount of objective evidence to support their decision that I am delusional,

    (c)   ... realized that they only had two ways to make me appear more delusional than I actually was: Create fake evidence and pass it off as rebuttal evidence, or sensationalize the accusations themselves, and

    (d)   ... decided on the latter of those two solutions.

45. Under the standard I advocated ¶ 38(a), the defendants would therefore be classified as delusional. Maybe they had another reason for trying to sensationalize my accusations to astronomical levels, but they have not offered one yet. Until they offer a better excuse, then it should be presumed that their only plausible motive is to make me look delusional when I'm really not.

46. But aren't we forgetting something? I'm not a doctor. I cannot just arbitrarily create new standards for mental disorders, any more so than the Defendants can. Even if the medical community may one day adopt my advocated standard for delusion, they have yet to do so. At this current time, to be delusional, the medical community has dictated that the belief be maintained in the face of affirmative evidence to the contrary, not simply that the belief is maintained in the complete absence of evidence. See **Undisputed Fact No. 14**.

47. Well, the Defendants are still delusional, even by that heightened standard. See **Undisputed Fact No. 15**. The State, acting through its judicial agent[4], was met with irrefutable evidence that I was, indeed, victimized by acts of government corruption (in this case, ex parte

---

4 The acts of the agent are the same as the acts of the State. See Footnote #1 of this Brief.

communications). We know they considered the evidence irrefutable because the State's agent felt absolutely compelled to recuse himself over this evidence, even though he absolutely despised having to do so; he did it because he *had* to. He would not have felt so forced if he did not feel the evidence was indisputable.

48.    And yet ... in that same document, he nevertheless maintained his belief that I was delusional for believing that I was victimized by any government corruption! The State – acting in a representative capacity – claims that my accusations were both vindicated and delusional at the same time!

49.    The State of Arkansas maintains that my accusations are both vindicated and delusional at the same time!!!

50.    I've never seen anything like this in my life! This is the sort of thing that logical paradoxes are made out of ... like the "Paradox of the Court" (also know as the "Lawyer Paradox"), where a law school student is simultaneously liable and not liable to his mentor for the cost of tuition! The only difference is that paradox is taught to people for the specific purpose of highlighting how little sense it makes, whereas the defendants in this case are playing their current paradoxical logic completely straight.

51.    From such overwhelming evidence, we can safely conclude that I am not the delusional one in this case; they are! The Defendants argue that delusion is sufficient grounds, without more, to disregard anything a delusional patient says out of hand. So by their logic, THEY are the ones – not me – whose testimony should be ignored.

## RELIEF AND DAMAGES

52.    With it established beyond genuine dispute that the Defendants are unlawfully retaliating against me, we now turn our question to what kind of relief I should be entitled to.

...

## Injunctive relief

53. First, I request an injunction against the State of Arkansas to, permanently and perpetually, cease and desist any and all retaliation against me.

54. Specifically, I ask that the Defendants be enjoined from ever again using my litigation history as a factor in any of their actions or omissions. No "conspiracy" should be needed; no "meeting of the minds" between two or more government agents to deprive me of my rights should need to be established. If my litigation history was even so much as a contributing factor in anything they do, no matter how big or small, then this requested injunction should be deemed violated.

55. This injunction should be deemed violated if the Defendants act, or fail to act, for no apparent reason, including and especially when they have an affirmative duty to do so. After all, that is what led to them being held liable in the first place in this case; they had a duty to act (to correct a deficiency in the record, and also to investigate and enforce the law when the latter duty was not discharged), but they failed to do so for no reason whatsoever. The fact that no apparent reason, other than retaliation, even appeared to motivate their actions is what led them to be held liable according to this motion in the first place.

56. An exception to this rule can be made in the event that the defendants already were required to engage in the adverse action regardless of any aggravating or extenuating circumstances. For example, if the Clerk refuses to file a pleading from me, not because she does not like me, but because it does not have my signature on it, then the Clerk, as well as the State of Arkansas, should be held to be in violation of this injunction.

57. An important key word in that exception is "required." This injunction should still be deemed violated if the Defendants A) had any discretion in their duties, and B) retaliatory animus

appeared to play a role in their decisions. Case in point: In the binding precedent of Amir v. St. Louis University, 184 F. 3d 1017 (8th Cir. 1999), a medical school's instructor had discretion whether to pass or flunk Amir, one of their students. However, even though the instructor could have come up with an infinite number of grounds to flunk Amir, the Eighth Circuit nevertheless ruled that, if Amir could prove that retaliation played even so much as ***a role*** in the instructor's grading scheme, he is entitled to recovery.

58. That is the injunction I request.

### Damages

59. Since their failure to correct the record has the effect of putting my appeal (and, by proxy, my entire case) on the shelf indefinitely, I also ask that the Defendants be ordered to compensate me for that loss.

60. First, there is the value of the state court civil judgment that the Defendants' retaliation is preventing me from obtaining. In the "Complaint and Jury Demand" in this case, I stated that this amount was $11,000,000. However, while compiling the exhibits for this motion and re-reading the transcript from the April 2, 2015 jury trial, I remembered something: In that trial, I had changed my request for damages from $11,000,000 to $16,173,000. See **Exhibit R**. I can do that because, as both Arkansas and Federal Rules of Civil Procedure 54(c) state, with the exception of default judgments, a party can recover whatever relief he is entitled to, regardless of whether it was requested in the pleadings or not.

61. Because that is the relief I sought in the state case, that is the relief the Defendants cost me, and therefore, the relief the Defendants should to me for.

62. Second, the Defense is also costing me postjudgment interest on that judgment. Federal courts have the lowest post-judgment interest of any judiciary in the nation, and it is usually less

than a percent per annum. The State of Arkansas, however, has a post-judgment interest rate of 10% per annum (see A.C.A. § 16-65-114), and a pre-judgment interest rate of 6% per annum (see Riceland Foods, Inc. v. Pearson, 357 SW 3d 434, 443 (2009)). In Doc. 2 of this case, I explained how, mathematically, that comes out to $3,013.70 per day. But that was based on the assumption that the principal was $11,000,000. Since my requested principal has been increased to $16,173,000 due to the arguments contained in the last two paragraphs, that means the interest has increased to $1,617,300 per year, and therefore, $4,430.96 per day.

63. Therefore, I request additional damages of $4,430.96 per day, starting at October 7, 2016, when they first defaulted on their obligation to supplement the record. These extra damages should continue to pile until the debt is judgment is paid in full.

## CONCLUSION

64. This Court has granted me leave to proceed in forma pauperis. See Doc. 4. This means that this Court has endorsed that, if I can prove the allegations in my Complaint (Doc. 2) exactly as described in said complaint, I would be entitled to relief. Well, every single factual allegation in the complaint – including ¶¶ 22(a)-(b) and ¶¶ 24(a)-(f) – have been shown to be 100% as I described. Therefore, pursuant to this Court's endorsement as to the sufficiency of these facts, it is now time for this Court to make good on its endorsement and award me the relief I am entitled to.

65. Wherefore, premises considered, I respectfully request that the Court enter summary judgment in my favor, award me damages of $16,173,000 plus $4,430.96 per day, starting from October 7, 2016 until the debt is paid in its entirety, enjoin the Defendants from ever retaliating against me ever again, award costs incurred, and any other relief to which I may be entitled.

So requested on this, the 16th day of February, 2017.

/s/ David Stebbins
_____
David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com